Julie M. Joki; Timeline: First formal harassment complaint until termination (July, 2004 through October 5, 2006).

After years of subtle and not so subtle discrimination and hostility, I finally filed a public, written complaint with Rogue Community College (RCC) at a meeting held on August 4, 2004. What follows is a timeline of events, beginning with my request for a meeting. I have included exact dates where possible:

- July 20, 2004: email sent to Human Resources (HR), Cindy Hauser (my associate dean), Verne Underwood (Humanities Dept. Chair; my dept. chair; direct supervisor); Mike Laam (associate dean), and Charlotte Hutt (my friend and colleague; Charlotte Hutt is a full-time faculty member in the mathematics dept. at RCC). This email (sent high importance) notified RCC and my dept. chair that I was being harassed by my dept. chair and discriminated against; in this email I asserted a claim about hostile work environment. (**see Exhibit 1**)
- August 4, 2004: meeting with managers: Mike Laam, Cindy Hauser, and Galyn Carlile (dean of instruction, whom Cindy Hauser had invited without my knowledge); Verne Underwood and Charlotte Hutt were also present. I read from a prepared statement and presented copious evidence to assert my claim of harassment and discrimination. These documents included workload distribution charts, rude and unprofessional emails (including one particularly damaging message from my department chair, Verne Underwood, where he informed me that my real problem was that I had *Penis Envy;* **see Exhibit 2**).
- Cindy Hauser prepared a synopsis of this meeting and also guaranteed that management would take certain steps to remedy the problems. (This synopsis, dated August 5, 2004, is attached as **Exhibit 3.**)
- August 11, 2004: meeting with Cindy Hauser, Verne Underwood (who brought Paul Fisher as his Union Representative). This meeting was, as I was told by Cindy Hauser, called to resolve the workload issues. In fact, though, the meeting was a forum where Verne Underwood yelled at me, Cindy Hauser insisted that I substantiate all of my claims against Verne Underwood, and the workload issues were not resolved. I ended up walking out of this meeting after being browbeaten for nearly an hour. This meeting was the first direct attack by management for my complaint.
- August 11, 2004: three hours after the meeting with Cindy Hauser and Verne Underwood, I was physically assaulted by Verne Underwood in the Writing Center as I sat grading student papers.
- August 11, 2004: Mike Laam (who later became my associate dean) told me I needed to get an advocate from the Sexual Harassment Network, called the Human Resource Network (HRN).
- August 15, 2004 (approx.): I received my **first ever** notice of a student complaint (via email sent by Kori Beiber, Associate Dean, Student Services). At that time, I revealed to Kori Beiber the complaint about sexual harassment/hostile work environment that I had filed against Verne Underwood. Kori's response was, "Well, certainly he didn't want you sexually." Before becoming an AD, Kori Beiber was a student counselor and handled many student complaints/problems, including complaints about sexual harassment made by students.



- August 17, 2004:  With Betsy Fuller (my HRN advocate), I met with Cindy Hauser because problems in my work environment were escalating and I wanted to know what was going on. During this meeting, Cindy Hauser blatantly lied about her actions subsequent to the August 4, 2004 initial complaint.  Betsy Fuller and I discussed Cindy Hauser's misrepresentations, misconduct and malfeasance after this meeting.

- August 21, 2004 (approx.):  I agreed to meet with Verne Underwood and Betsy Fuller. During this meeting, Verne revealed that on August 5, 2004, *Galyn Carlile had called a meeting with Verne Underwood, Galyn, and Cindy Hauser.  During this meeting, Verne Underwood had been threatened with his job by Galyn Carlile and ordered to "shut me [Julie] up."*  During or following this meeting, Cindy Hauser told Verne to take certain actions against me.  I begged Verne to tell Peter Angstadt (College President) about Galyn's threats and Cindy's orders, but Verne refused.

- Between August 21 and October 21, 2004:  Several meetings, ongoing harassment by Cindy Hauser and Galyn Carlile.  Negotiations with the college, etc.  During this period, I also filed a claim for disparity in salary based on gender discrimination, which was later sustained and the college agreed (after the OEA filed a Level I Grievance) to pay me seven years of back wages as well as immediately raise my pay level two steps on the faculty salary scale to make my salary consistent with all of the male members of my department.

- September or October, 2004:  Because the actions by management had become so hostile and because they were violating both the College's protocol for handling harassment complaints as well as violating State and Federal laws regarding the handling of such complaints, I met with Peter Angstadt to voice my concerns and ask for his assistance in relieving what I considered to be egregious acts of malice and misconduct by management.  At that time, I presented Peter Angstadt with a written description of what I found to be the most overt violations by management, and also included a summary of discrimination and harassment I had been subjected to over the years by both Galyn Carlile and Cindy Hauser.

- October, 2004 (approx.):  I became Writing Coordinator for the Humanities Department. During a presentation I gave, where all members of my department as well as all part-time writing faculty were present, I was publicly humiliated, to the point of being ridiculed, by another male member of my department, Wolfgang McAnich-Runzi.  The environment of the presentation grew so hostile, in fact, that another full-time faculty member in my department, Chip Phillips, complained right then to Verne and told him he had an obligation to stop Wolfgang's nasty attack against me.  Verne ignored Chip.  I likewise spoke with Verne (in the hallway), but he said he had no idea what I was talking about—he didn't even notice that there was a problem.  Wolfgang was president of the Union at the time.

- October, 2004 (approx.):  I complained to Cindy Hauser about Wolfgang's unprofessional, personal attack as well as Verne's reactions (or failure to take appropriate action).

- February, 2005:  Finally reached a settlement with the College about the wage discrimination claim, and RCC paid me the disputed amount as agreed over a three-month period. (see **Exhibit 4**).  When the College implemented the settlement, they immediately raised my pay scale based on the revised rate; however, the College miscalculated and overpaid me by $3,000 in the first settlement check.  I returned the money and corrected the error, an error which would have resulted in me receiving an extra $3,000 every year.  Marilyn-Mills Uribe (Human Resource Specialist) said she had never had anyone return money and that the error would probably never have been discovered.

- March or April, 2005 (approx.):  Acting on a student's request, I met with Redwood Campus Dean, Nancy Maxwell.  The student (Jerry—last name withheld for confidentiality) had come to me about a very disturbing incident where she had happened upon a male faculty member engaged in a sexual act with another student in the parking lot at RCC.  The faculty member, JD, was sodomizing one of his students (a student in Jerry's class) in his car in the upper parking lot of RCC.   While I had heard many complaints about this particular faculty member over the years (as well as his own boasting about his sexual exploits with students), this was the first time a student with first-hand knowledge about such sexual misconduct had come forth.  Jerry was quite distraught; she said that she was nervous about complaining, but that she simply had to say something as she was also a student in JD's class at the time and didn't know what else to do—Jerry didn't feel that she could go back to her history class after what she had witnessed in the parking lot; Jerry was also afraid because JD had seen her.  Jerry asked that I speak to Nancy Maxwell on Jerry's behalf, but that I not use her name.

    In my meeting with Nancy Maxwell, even after I explained in great detail what Jerry had related to me, Nancy Maxwell stated that there was nothing she or the College could or would do about the student's complaint.  I said to Nancy that I believed Jerry's allegations.  I also revealed to Nancy Maxwell some of my personal history as a sexual assault survivor and stressed that what Jerry had experienced in the parking lot was very traumatizing to someone with a history of sex abuse.  Jerry had revealed to me that she, too, had a history as the victim of violent sexual abuse.

    Nancy said that JD was a member of the Sexual Harassment Committee, and that he was in charge of counseling perpetrators of sexual harassment.  I told Nancy that not only had JD previously boasted about his sexual exploitation of students, JD and many, many other male faculty members used their positions on the Sexual Harassment Committee as ways to cover their own inappropriate sexual misconduct with students.

    I told Nancy that the problem with male faculty sexually exploiting female students was so widespread and prevalent at RCC that another female staff member had coined the term "fornicating faculty" to denote those male faculty members who engaged in such activity.  I gave Nancy Maxwell a listing of several names, which included department chairs, an associate dean, and numerous male faculty members across all departments across all campuses, as well as former RCC male faculty who had been dismissed (given early retirement), but only when husbands of the students filed complaints with the College, such as the case with RR.  (see **Exhibit A**)

    I emphasized the depth and breadth of what I explained was an extremely hostile, sexually-exploitative culture at RCC which posed a threat to female students.  Even with all of this information, Nancy said she could do nothing; she refused to initiate any type of investigation; I asked that she at minimum speak with Peter Angstadt about the problem.  Nancy said she would.  I really thought Nancy would do the right thing and would use her position and knowledge to address the problems I had made public.  I never received any follow-up from Nancy about this meeting with her; Jerry, though, was called in to speak with Nancy; Jerry quit school.

- March or April, 2005 (approx.): Within two weeks after my meeting with Nancy Maxwell I received an email from Nancy notifying me that I had a registered sex offender as a student in one of my writing classes.  I was quite alarmed, as this was the **first ever** notification of this type I had received.  I requested further information, including the student's name as well as specifications about the nature of the offense—I particularly wanted to know whether

the student was considered a predator or if the student was violent. Nancy wrote back, gave me the student's full name (Robert—last name withheld for confidentiality) and assurance that the offense was neither violent nor predatory in nature.

**\*\* I would like to note here that this same student had been registered in and completed other writing classes from me over the previous year. Yet, while his status as a sex offender had not changed during this period of time, I had received no previous notifications from Nancy Maxwell about Robert or any other registered sex offender. I had several conversations with Robert, and he felt harassed by the College's insistence on this new notification. Robert eventually dropped out of school.**

- May, 2005: My advocate (Betsy Fuller) retired from the College.
- August, 23, 2005: On the last day of the teaching session for summer term, I was called out of town on a family emergency. While I was gone, Cindy Hauser, acting in concert with Mike Laam, Galyn Carlile, and Nancy Maxwell (Redwood Campus Dean), had all of the locks changed on my office building and deactivated my electronic pass key, effectively denying me (without my knowledge) access to all college property. Cindy Hauser specifically ordered plant services to keep me from entering my office upon my return, barring me from collecting my student's final projects, the grades for which were due the following day.
- September, 2005: I received a notification via certified mail from Galyn Carlile that I was to attend a meeting on September 21, 2005 regarding disciplinary actions for my absence on August 23, 2005.
- September 21, 2005: I attended a meeting, bringing Paul Fisher (Union Grievance Chair), with Galyn Carlile and Cindy Hauser. I was issued a four-point letter of reprimand by Galyn Carlile (which I refused to sign). In fact, I told Galyn that I refused to acknowledge his right to abuse and threaten me in such a manner. I left the meeting.
- September 26, 2005: After the meeting with Galyn Carlile and Cindy Hauser, I responded to an email sent by Paul Fisher asking me what I wanted. (see Exhibit 5).
- September 27, 2005 (approx.): During the first week of classes, I saw Nancy Maxwell outside of Coates Hall. I told Nancy that I had not violated any College policy, and she responded that I had. Nancy then leaned over and whispered to me, "Kori Beiber will be taking over the sex offender notification process." Nancy then walked away.
- October 4, 2005: A Level II Grievance was initiated on my behalf by the OEA (Paul Fisher, Grievance Chair); document drafted by Liz McKanna (attorney for the OEA). The Grievance claimed continued harassment by the College and retaliation by Galyn Carlile and Cindy Hauser as motivation for the actions taken against me in late August, 2005. (see Exhibit 6).
- October, 2005: In a meeting with Peter Angstadt (RCC President), I strongly voiced my concerns about Cindy and Galyn and the personal and professional threat they represented to me, and I also refused to work under their supervision—to me, this was a non-negotiable point, although Peter Angstadt repeated almost verbatim the "line" he had fed me the previous year, something to the effect that RCC guaranteed that all its employees had the right to a workplace free from harassment and discrimination. At that meeting (Paul Fisher was present), I told Peter Angstadt what Verne Underwood had revealed to Betsy Fully and me the previous year about Galyn Carlile and Cindy Hauser's orders concerning Verne's

need to "shut me [Julie] up." I told Peter that Galyn and Cindy had violated every standard of decency, that their vicious behavior constituted retaliation, and that I would not, under any condition, work under their supervision. At that meeting, I gave Peter multiple examples of Galyn and Cindy's violations of stated College policies, as well as their violations of State and Federal Employment and Labor laws. I also gave Peter a written statement regarding my concerns.

- November 17, 2005: The College asked for and received an extension of time to comply with the remedies sought in the Level II Grievance. This extension also further refined the specific remedies sought by me in order to secure my protection from Cindy Hauser and Galyn Carlile as well as requested a guarantee from the College that all retaliation against me would be stopped and remedies would be put in place to rectify what was an extremely hostile, retaliatory work environment for me. (see **Exhibit 7**)

- November, 2005: The College issued several drafts of a letter to address the remedies I sought in the Level II Grievance. I refused to accept the first several offers, as I was still being subjected to ongoing discrimination and management retaliation and I wanted a guarantee in writing from the College that I would never again be subjected to any form of supervision by either Cindy Hauser or Galyn Carlile. The final letter, dated January 15, 2006 (see **Exhibit 8**), was issued by the College and stated that my workgroup would be reassigned, guaranteeing that I would neither be subjected to any supervision by either Galyn or Cindy, nor would I be assigned to any workgroup which was supervised by either Galyn Carlile or Cindy Hauser. In this letter, Peter Angstadt also announced that the Letter of Reprimand had been removed from my personnel file as well as all documents relating to management's actions in August, 2005.

- Fall Term, 2005 (October or November): Verne Underwood (still my dept. chair and direct supervisor) began calling Mike Laam (my newly assigned associate dean) about one alleged student complaint Verne had supposedly received about me. In fact, Verne called Mike Laam eight times (I know this because I happened to be sitting in Mike Laam secretary's office when Verne made his eighth call). Sometime during this period, Verne and Mike met with the student (who was not registered in my classes at that time), and Mike later told me it had really been nothing at all**.

  I later formally complained to Mike that Verne was continuing his discriminatory treatment of me by breaking protocol regarding student complaints; the process for student complaints against a full-time faculty member are clearly delineated by College policy, and this complaint process specifies that before any other action is taken, first the faculty member is notified. The process is spelled out in great detail, and Verne Underwood and Mike Laam both violated the protocol. I complained to Mike Laam that Verne Underwood had violated protocol regarding the handling of student complaints; Mike agreed, but did nothing to remedy the situation. In fact, though, both Mike Laam and Verne Underwood violated the protocol as referenced in the Collective Bargaining Agreement and specified in the College's Student Rights, Freedoms & Responsibilities policy, but they did adhere to the protocol when handling complaints against male faculty members.

**I would like to note here that this was the second ever student complaint about me; the first one having been reported by Kori Beiber the week after I initiated my first harassment complaint against the college.**

- April or May, 2006:  I attended a professional dinner with Verne Underwood and Lutz Kramer (full-time instructor in Humanities; former department chair of Humanities).  During this dinner (which preceded the local high school academic masters, where the three of us were to be the judges for the literature/writing competition), Lutz began the conversation by telling us some particular pasta dish had derived its name because it was made from leftovers and fed to the night's whores.  Verne followed this bit of wisdom by announcing that today (whatever day that was) was the day that women finally broke even for the year and began to make money equal to men.  He elaborated, stating that because women were paid so much less than men, that it was not until April (or May?) of every year that women's salary became equal to men's.  My retort was, "Well, certainly that's not true in my case."  To which they responded, "Well, everyone knows you are not a normal woman, Julie."

     I was very, very uncomfortable and quickly realized that these men had no intention of talking with me as a professional—a sentiment I verbalized.  After a rather prolonged silence, I suggested we play a game and see if we could answer the questions that the academic masters' students had completed the week before.  Verne, who had the file sitting before him, thought this was swell idea, and began reading the various text passages and titles.  Lutz and I then tried to name either the character from the passage or the author of the text.  When the game was concluded, I told Verne that I found it quite interesting that he had not included in his (40+) questions a single female—neither character nor author.  Verne seemed shocked at this realization; Lutz, on the other hand, offered this bit of wisdom, "Well, everyone knows that women have never written anything worth reading or said anything worth writing about."

     I left the restaurant and went home; I did not attend academic masters.  I was simply done with this type of repeated, ridiculous, derogatory commentary about women.  (Note:  The College paid for this dinner as it was a professional activity).

- April or May, 2006:  The next working day following academic masters, I received an email from Mike Laam (with cc send to Nancy Maxwell and Cindy Hauser) that I was to be held accountable for my absence at academic masters—a most public, professional event.  Mike demanded that I contact him immediately to schedule a meeting to explain myself.  I immediately responded to Mike Laam that I had no problem meeting with him, the sooner the better.  At the follow-up meeting, I took both Chip Phillips (fellow full-time faculty member of the Humanities Dept.) as well as Theresa Van Ravenhorst (Director of the Writing Center, another member of the Humanities Dept.).  I brought Chip and Theresa to speak with Mike about the depth and breadth of harassment/discrimination I was continually and currently subjected to as a member of the Humanities Department.  When the three of us entered Mike Laam's office at the scheduled meeting time, and I explained why I had asked Chip and Theresa to join us, Mike Laam started screaming (literally) that he would not meet with Chip and Theresa present; Mike became so forceful in his refusal (actually jumping up and down as he continued shouting), that both Chip and Theresa left the office.

     I remained behind and had a meeting with Mike Laam; Mike's first words to me, as he told me to sit in his office, were, "You're not in trouble, Julie."  I responded that I was very clear about not being in trouble.  I then proceeded to narrate the events of the professional dinner I had attended with Verne and Lutz, as well as my decision to go home immediately after leaving the restaurant.  Mike and I talked for about half an hour; at another point, Mike stated that by not attending academic masters I was just continuing to be Verne and Lutz's victim.  I retorted, "Oh no, Mike, you have it wrong.  Had I gone to the masters competition

after being spoken to and treated as I was at dinner, then I would have been Verne and Lutz's victim, and I am simply done assuming that role." Mike then said how much the students had missed my presence at the masters competition; I told Mike that that was the responsibility of the College for allowing the type of continued treatment I was receiving.

Towards the end of the meeting, Mike Laam informed me that he was going to send an email to Cindy Hauser explaining that I [Julie] was too emotionally upset to attend academic masters. I told Mike I did not want any emails or any other form of communications about me sent to Cindy Hauser.

I think it was during this meeting that Mike Laam suggested I resign as Writing Coordinator because it [working in a professional environment with Verne and Cindy Hauser] was obviously causing me stress.

I remember Mike specifically stating at the conclusion of the meeting that what had happened at the dinner was to go no further than his office. The matter was finished as far as he was concerned, although he was going to schedule a follow-up meeting to discuss the matter with Verne and me.

- One week later (approx.): At the follow-up meeting with Mike, Verne, and me, Mike spoke about my resignation as Writing Coordinator and he told Verne Underwood that Verne was not to speak with me alone, nor I to him, in any professional capacity (including college-sponsored events off campus). Mike stated that this rule would be enforced for my protection as well as Verne's.

- May 21, 2006 (approx.): College in-service was held on Table Rock Campus; I did not attend the morning session, but rather arrived around 12:00 pm; I found Verne at the Union meeting, handed him the department's laptop, and told him that I was not teaching that summer. I left the room. Verne followed me out of the room, and asked me to please speak with him. I said there was nothing left to talk about. He pursued me; I began crying. He said he just wanted to talk with me for a minute. I went into a small office with Verne (leaving the door open) and we talked for a few minutes. I was crying; I told Verne that I now understood that it would never matter what I did or what I said, that I would never be treated as an equal among my peers in the Humanities Dept. I told Verne that I was certain he would have no trouble finding replacements to teach my summer classes—Verne agreed that there would be plenty of part-time faculty who would be happy to have the money.

About an hour later, I attended the Humanities Dept. meeting—Cindy Hauser was present. After the presentation by the Library staff (a project I had been working on with the staff over the preceding year), I made ready to leave. As I was exiting, Cindy Hauser approached me and asked where I was going—I told her I was not feeling well (my body—neck, back, underside of my arms, etc., was covered in hives) and I was going home. I had already filed a sick leave request for the day.

- The next working day there was an email sent from the President's office to Mike Laam, Cindy Hauser, Human Resources, and me about my late arrival at in-service. (There are hundreds of employees at RCC, but the email from the President's office only mentioned my lateness. Several other employees also arrived late, but no emails were sent about their late arrival; as I said, I had already filed a sick leave request for the day.)

- The second day after in-service, I received an email from Mike Laam that, because it had been determined that mangers were overwhelmed by too burdensome of a work load, all intensive full-time faculty evaluations (which were on a three-year cycle) would now be rescheduled on a five-year cycle. **Any faculty who had a compelling reason for having**

their evaluation completed as originally scheduled could, however, contact Mike and he would finalize the evaluation.

- The third day after in-service, I contacted Mike Laam and requested that my intensive evaluation be completed as scheduled. I had already submitted my portfolio (one or two month's previously); I had finalized and submitted all requirements for my three-year intensive evaluation; Mike Laam had already conducted his in-class instructional evaluation of me (along with a two-hour follow-up meeting); all documents required for my three-year evaluation were done; I wanted my evaluation finalized and made a permanent record in my personnel file. Mike Laam refused to complete my three-year evaluation as scheduled. Mike did, however, finalize at least one other full-time faculty member's three-year intensive evaluation during that same period. **(Note: In his letter in January, 2006, Peter Angstadt had specifically promised that my evaluation would be completed by an associated dean other than Cindy Hauser—Mike Laam was to complete my three-year intensive evaluation in the Spring of 2006; Mike Laam did not complete my evaluation, even though I specifically requested he do so).**

- June, 2006: I completed teaching my classes, turned in my grades and went home.

- September 23, 2006 (approx.): Fall in-service. I entered the building during the fall faculty/staff in-service presentation; I saw Galyn Carlile; he made a gesture to me from across the room (gymnasium); I left the building: I spoke with Paul Fisher (Union Grievance Chair) in the parking lot outside and Paul told me that the College had been meeting about me over the summer; I said I was not going to engage in another round with the College; I told Paul that I could not emotionally, psychologically, or physically handle another managerial assault. I told Paul Fisher that I was done being harassed and lied to by the College. I also told Paul that I was really clear that RCC had no intention of honoring any of its agreements with me or ever remedying the hostility in my work environment.

  **(Note: Over the preceding year, I had sent several emails to the OEA stating that I would be forced to quit my job if I did not get some relief from my hostile work environment; I had also had several conversations with Mike Laam about the continued harassment I was being subjected to; at one point Mike Laam suggested that I should look for other work, perhaps, Mike suggested, I "could get a job training other teachers." Mike Laam clearly understood how stressful my work environment was.)**

  While I understand that Oregon is an "at-will" employment state, no employer has the right to willfully discriminate against, harass, or otherwise inflict harm on an employee. The College was bound to particular employment protocols by the Collective Bargaining Agreement, which specifies procedures for employee dismissal, treatment of full-time faculty in terms of salary placement, promotion, etc. Thus, Oregon's "at-will" employment status does not free the College from adhering to the terms of the Collective Bargaining Agreement relative to the contractual obligations for full-time, tenured faculty.

- September 24, 2006 (approx.): Fall in-service day two: On his request, I gave Paul Fisher copies of two letters which had been sent by Hank Kaplan (the OEA's copyright attorney) to the College President's office four years previously regarding copyright to the Rogue OWL. I attended the Humanities Dept. meeting. After the meeting (but before everyone had left the room) I asked Verne Underwood some questions about the Criterion automated writing assessment program (which I had instituted over the previous year in my capacity as Writing Coordinator); the program had been piloted over the preceding summer and I wanted to know some details about its interface with student writing placement, student responses, etc., as the

Department had decided to adopt the program and it directly affected my writing students for the upcoming academic year. Verne Underwood refused to speak to me. He would not answer my questions; he did not speak a single word to me; he turned his back on me and left the room with other members of my department.

- September 27, 2006 (approx.): Classes began; I taught three writing classes and two public speech classes. MWF two Speech 111; T/Th two WR121; one WR122.
- October 4, 2006: In spite of my objections to meeting with RCC management (objections I voiced in telephone conversations (including one the night of October 4, 2006)), Paul Fisher (as requested by RCC Management) sent an email to RCC managers and me regarding the scheduling of a meeting to discuss copyright issues. **(Note: The copyright issue had been resolved four years previously; on October 4, 2006, almost a year after RCC's president Peter Angstadt had guaranteed that I would not be assigned to a work group that was supervised by Cindy Hauser, I was still assigned to the same work group (Humanities Department), which was still supervised by Cindy Hauser, the associate dean who had over the length of my employment at RCC harassed me both directly and indirectly, constantly and consistently, whom I had complained about, filed Grievances against; the same associate dean who had been accused of malfeasance, malicious intent, and direct retaliation against me; *see Exhibit 9*.)**
- October 5, 2006: I arrived at my first scheduled class (WR122) about five minutes late (9:35 am). Mike Laam was seated in my classroom. I went over to Mike and asked him what he was doing in my classroom. Mike said he had received a student complaint, but he would not elaborate. I handed Mike my letter of resignation (**see Exhibit 10**). Mike's comment was, "Don't you think this is a bit extreme, Julie." My response to Mike was, "Mike, if I worked anywhere but RCC, this would be extreme." Mike said, "I agree with you."

  I told my students I would be right back, left the room, went to the Writing Center (located in the same building), sent a copy of my resignation letter via email to ALL OF RCC, returned to my classroom (Mike was gone) and taught my class. Apparently the student complaint that Mike had alleged he received was no longer a big deal.

  I also taught my two other classes scheduled for that day (Mike did not come to either of those classes). After I finished teaching my scheduled classes, I went to the personnel office and asked about termination regarding my PERS account; Christine Murff (a member of the Human Resources staff) wrote down and gave me a phone number to contact PERS. I then went to my office in Q Bldg., spent about two hours sorting and boxing my personal items, loaded the boxes into my pick up, and went home.
- October 5, 2006: I arrived home around 6:20 pm and found a business card on my door from Jamie Joswick, Grants Pass Police Department, asking that I telephone him ASAP. I phoned Jamie and he told me he was coming over. Jamie Joswick was a former student of mine and I had worked with him over the past year on several grants he was submitting to raise funds for projects he worked on in the community to help at risk youths.

  About two minutes later, two Grants Pass Police vehicles arrived; based on a phone call from the President's office at RCC, the two officers, arriving in two separate vehicles, blocked off my road (a dead end) and exited their cars. I came out into the street, raised my hands and said to Jamie, "Don't tell me it's against the law to quit my job." I was joking, until I saw the second officer reach for his gun. At that point, I realized something was terribly wrong.

Jamie held up his hand, told me to stay where I was and began asking me questions, which I answered. Jamie then told the other officer that everything was okay, and the other officer relaxed, removing his hand from his holster. After a bit more conversation, Jamie told the other officer he could leave, which he did. As Jamie and I continued to talk, I offered to have Jamie come into my home and read the letter of resignation that I had submitted to the College that morning. Jamie read the letter and said that the content of my letter of resignation did not match what the College had reported to the Grants Pass Police Department.

It took a long conversation with Jamie Joswick to discover that the College had actually sent the police to my house by claiming that I was a threat and that I had bought a gun. The College also told the police that my son, Tyler (a former U.S. Marine) had been recalled to Iraq. None of these things were true; my son (who is now a U.S. Coast Guard) lives in Portland, Oregon with his wife, Teresa. I did not buy a gun. At no time did I ever make any threats to or about the College, although the College, in its report to the Grants Pass Police Department, claimed that I had made threats against it. Rather, the College, in filing a misleading report with the police, continued to threaten my well-being even on the day I resigned.

In my conversations with Officer Joswick, Jamie expressed both anger and disgust at the College's actions. Jamie told me that the College had supplied misleading information to send the officers to my home.

Here are some names and telephone numbers you may find useful in investigating this matter:

Betsy Fuller: 541-412-2940  (Betsy Fuller lives in Brookings, OR with her husband, Dave)
Theresa Van Ravenhorst: 541-956-7167 (wk); 541-761-0072 (cell)
Chip Phillips: 541-956-7256
Charlotte Hutt: 541-226-7868 (cell)
Officer Jamie Joswick: 541-474-6370
Tyler Joki: 971-998-4378

**Cc:** Human Resources Department; Underwood, Verne; Hutt, Charlotte
**Subject:** Issues surrounding Julie Joki's workload
**Importance:** High

Cindy and Mike:

I believe the issues surrounding my workload assignment for next year are beyond the simplistic view of, "Julie has problems with her workload." In fact, my workload assignment is merely a symptom of a much larger and more serious issue in my department, that of inequality. In my last telephone conversation with Verne, when I tried to broach the issue of inequality in workload assignments, the dialogue quickly disintegrated, as Verne called me "schizophrenic" and stated that my "behavior was schizophrenic." This type of name calling and personal and professional debasing is completely unacceptable to me. As the Chair of my department and as my superior for purposes of determining workload and course scheduling, I believe that Verne has demonstrated unwarranted hostility if not outright discrimination towards me. As these types of situations tend to fester over time, I believe it is in everyone's best interest to get the air cleared ASAP. Therefore, I would request that you reschedule the meeting as early as possible. I am willing to get a substitute for my classes if that's necessary.

Julie Joki
Rogue Community College
Humanities Department
3345 Redwood Hwy.
Grants Pass, OR 97527
(541) 956-7054

8/14/2004

Exhibit 1

**To:**      Joki, Julie
**Subject:**    RE: AAOT changes

-----Original Message-----
**From:** Underwood, Verne
**Sent:** Wednesday, January 21, 2004 1:52 PM
**To:** Joki, Julie
**Subject:** RE: AAOT changes

You know, I've never made a grammatical error—I'm perfect (and white, and a male). I think your issue centers less around grammar and more around . . . . are you ready . . . . penis envy. You see, "I" is a phallic shape, and "me" is more like a vagina, so you immediately went for the symbol of male power, the penis, rejecting out of hand the femaleness of the genitive case.

--Verne

P.S. Actually, I haven't looked at that many vaginas, and in fairness, I don't recall one ever looking like *me* . . . . er, I mean to say that no vagina ever resembled . . . . . . . . . . . . . . . . . . . . I think I need therapy.

      -----Original Message-----
      **From:** Joki, Julie
      **Sent:** Wednesday, January 21, 2004 1:44 PM
      **To:** Underwood, Verne
      **Subject:** RE: AAOT changes

      ME an Lutie

      JULIE JOKI
      ROGUE OWL PROJECT DIRECTOR
      WRITING CENTER DIRECTOR

        -----Original Message-----
        **From:** Underwood, Verne
        **Sent:** Wednesday, January 21, 2004 1:43 PM
        **To:** Joki, Julie; McAninch-Runzi, Wolfgang; Kramer, Lutz; Williams, Richard C.; Phillips, Charles "Chip"; Herr, Dorcas; Kidder, Bobbi; Cole, John
        **Cc:** Hansen, Donna
        **Subject:** RE: AAOT changes

        Actually, the nominative case cannot go there, so I was thinking of "him" or "her" or "me" . . . but not thinking of I.

        Your ball,
        --Verne

          -----Original Message-----
          **From:** Joki, Julie
          **Sent:** Wednesday, January 21, 2004 1:41 PM

*Exhibit 2*

*Cindy Hauser's synopsis of 8/4 meeting*

August 4, 2004

Present: Julie Joki, Charlotte Hutt, Galyn Carlile, Mike Laam, and Cindy Hauser

Julie requested the meeting to discuss her perception of a hostile work environment and her inequitable workload. She provided an outline of the working environment issues.

Julie began the meeting with a statement of her feeling that Verne had created a hostile work environment through emails, phone calls, and his behavior towards her during department meetings. She provided documentation of emails from Verne that she felt were inappropriate and unacceptable. She also cited several incidents in meetings where she felt discounted and disrespected in front of her colleagues. She felt that this hostility occurred through remarks, innuendos, and put-downs that resulted in her being ostracized and ignored within the department.

Verne responded that he did not mean to discount or disrespect Julie through emails, conversations or meetings. He understands now that his humor was misplaced and inappropriate and indicated he would no longer use this type of humor in any communication (emails, conversations, meetings). He apologized for any feelings that Julie perceived created a hostile environment for her.

Regarding the workload issues:

1. Part-time faculty assigned to courses she requested.

2. Other full-time faculty not required to teach nights to be assigned desirable literature courses.

3. Department chair misinformed her about who was assigned desirable literature courses and the reasons for his decisions.

4. Department chair stated that he based his decisions concerning literature course offerings on the "feelings" of one part-time faculty member.

5. Department chair has argued others in the department are more qualified to teach literature courses, but Julie feels she is as qualified, if not more qualified, than the faculty selected to teach those same courses.

6. Julie is teaching writing courses as 60 percent of her course load, significantly higher than the percentage for her department peers. (A chart is provided in the outline she provided.)

As a result of this meeting, Julie is asking:

1. To be treated fairly within the department, i.e.:
   a. appropriate email content.
   b. no derogatory remarks or comments to her alone or in front of her colleagues.
   c. inclusion within the department rather than being ignored or ostracized.
   d. professionally treated as an equal department colleague and within the faculty contract rights.

*Exhibit 3(1)*

e.  an equitable workload assignment and time slots.

Verne's comments:

1.  He did not mean to hurt or offend Julie.  He admitted that he used poor judgment in comments that he thought would be humorous.

2.  He feels he needs to handle his oral and written communications more professionally.

3.  He will redo her workload to make it more equitable and agreeable with julie.

4.  While he did take responsibility for his lack of judgment in his communications with her, he wishes Julie had come to him before this and expressed how she felt.  He asked that she communicate more with him in the future if she feels there is an issue like this again.  This will help him support her and manage the department better.

Agreement by both parties:

1.  Verne and Julie will rework her workload so that Julie feels it is equitable and also acceptable to both parties.

2.  Verne and Julie will communicate more often; Cindy will be included in any meetings and copied on all emails.

3.  Julie will assume the responsibilities for the writing coordinator.  This will mean a one course release in fall with the possibility of one course release in winter, subject to review.

4.  Julie will be treated by Verne as an equal member of the department without prejudice or hostility.

Finally, Julie wanted us to know that she thinks Verne does an outstanding job as department chair.  This was not a meeting to attack him personally; she was seeking resolution to a professional issue.

Cindy Hauser
8/5/04

Exhibit 3(2)

## SETTLEMENT AGREEMENT
### between
## ROGUE COMMUNITY COLLEGE
### and
## JULI JOKI

This Agreement is made and entered into by Rogue Community College (College), and Juli Joki (Joki) on February _____, 2005.

In settlement of the grievance filed by Joki regarding a wage dispute based on discrimination Joki agrees that in full and final settlement of the grievance and any other wage claim based on discrimination from the time of hire until the time both parties have signed this agreement the parties agree as follows:

1. **Payment.** The College shall pay back wages to Joki in the amount of Twenty One Thousand Three Hundred Seventy Three Dollars and No Cents ($21,373.00) gross pay. Payment of the stated amount shall be made in four equal payments over the period of four months on or before the regularly scheduled pay day for the College faculty, beginning as of March 1, 2005. For each payment, all reasonable and necessary deductions and contributions, including but not limited to Social Security, Medicare, and PERS contributions which would ordinarily be deducted and the College will timely and appropriately submit said amounts to the applicable authority for each payment. It is intended by the parties that said payments shall be treated in all respects as wage payment and the College shall take necessary steps to insure that sufficient deductions are made consistent with any legal taxing authority and that contributions are submitted to PERS and credited to Joki's PERS account consistent with the laws or Oregon and any regulations applicable thereto.

2. **Personnel File.** Appropriate documentation shall be placed in Joki's personnel file to reflect the change in salary each year consistent with the amount calculated on the documents attached hereto as Exhibits A and B, reflecting calculation of lost wages for the academic and summer terms from 1997 through the persent.

3. **Entire Agreement.** This Settlement Agreement contains the entire agreement between the parties hereto and the terms of this Agreement are contractual, not mere recitals.

4. **Informed Consent.** The undersigned represent that they have carefully read the foregoing Agreement, know its contents, and have signed the same as their own free act. The parties sign with the benefit of advice of counsel if they so chose.

5. **Consideration and Dismissal.** For, and in consideration of, the promises herein Joki agrees to dismiss her Grievance and to refrain from filing it again or file any other wage discrimination claim based.

6. **Effective Date of Agreement.** This Agreement shall become effective upon execution by the parties below.

*Exhibit 4*

1

**Rogue Community College:  Faculty Misconduct**
**This information is extremely confidential**

**Rich Reiner** (1994 or 1995) was the Chair of the Social Services Department[1] and taught, among other courses, human sexuality.  As a requirement in his course, Rich made female students reveal their most intimate sexual fantasies, which he then shared with other male faculty at RCC.  Although several female students complained, no action was taken by RCC management until the husband of one of the students filed a complaint with the College President (Harvey Bennett).  The husband filed the complaint because he caught Rich Reiner sodomizing the student (his wife) in Rich's office.  Rich was given a rewarding retirement package.

**Walt Padgett** (1996 on) was the Coordinator of the Art Department.  When Walt (who is 50 years old) began his sexual relationship with Julie, she was his student—Julie was 16 or 17 years old at the time.

**Jim Rich** (1996 on) was the Coordinator of the Music Department.  When Jim (who is 50 years old) began his sexual relationship with Heather, she was his student—Heather was 16 or 17 years old at the time.

**Lutz Kramer** (1994 on) was the Department Chair for Humanities[2] until 1999; Lutz also served one year (1998?) as an Associate Dean under Galyn Carlile.  Lutz (who is 60 years old) was married to another RCC employee, Patti Kramer.  Lutz openly boasted of his sexual exploits and used to tell students in his philosophy classes that he had an open sexual relationship with Patti and thus was free to have sex even though he was married.  Lutz began his sexual relationship with Lisa when Lisa was a student in his Ethics class.  Lisa was also a student in my writing classes, and Lutz would pressure me to turn over Lisa's papers to him so he could "help her."  I refused.  Lisa—who was in her mid 20's—was married with two small children.  Lutz ended up divorcing Patti, and Lisa also divorced her husband.  During the time Lutz and Lisa were "dating," the College paid for at least one trip for Lutz and Lisa to travel to the Caribbean.  Even after Lutz married Lisa, Lutz would ask me to introduce him to certain of my female students who he found attractive—I refused.

**James Dunn** (1997 on) is the Coordinator for the History Department.  James (who is in his mid 50's) openly boasted about his sexual exploits with students.  Before he came to RCC, James Dunn was a high school history teacher.  James began having sex with at least one of his high school students when she was 16 or 17 years old.  James married this student and had her legally change her first name, thus he renamed and remade her (his words, not mine).  In his faculty position at RCC, James Dunn sexually exploited his female students, trading grades for sexual favors.

**Dennis Kimzey** (1995?)  is the Department Chair for Mathematics at RCC.  Dennis (who is in his mid 50's) was married when he began having a sexual relationship with one of his students, Becca.  Dennis (who used College funds to take Becca to at least one math conference while he was still married to his first wife) later divorced his wife and married his student.  He then, although she was not qualified, hired Becca as a math tutor in the Tutoring Center.  Dennis used his position at the College to hire his wife in spite of the fact that several female faculty members complained about her incompetence (she simply was not qualified to be a college-level math tutor).

---

[1] The Social Services Department Chair oversees the History, Psychology, and Human Services Departments
[2] The Humanities Department Chair oversees the Art, Music, Foreign Language, and Theatre Departments



*Exhibit A(1)*

**JS** (2002?) is a full-time instructor in the Science Department at RCC.  He began having a sexual relationship with a female student.  John (who is in his mid 50's) was married to Marilyn (who also taught at the college) at the time.  John's "affair" became public and Marilyn was devastated.  Members of RCC management stated that Marilyn needed to "quit her whining."

**WR** (2003?) is a full-time instructor in the Humanities Department at RCC.   WR (who is in his late 40's or early 50's) used Learn & Earn funds from the College to hire "personal assistants"—female students.  At the time he began having inappropriate sexual relationships, WR was married with two small children. WR taught humanities courses in which he required students to attend a play in Ashland as a part of the course.  WR would purchase the tickets for these plays and then make his students buy the tickets from him; WR charged a $5 premium—over and above the price he had paid for the tickets—to each student.  WR pocketed the money

**Paul Fisher** (1994 on) is a full-time instructor in the Business Department, and serves as Grievance Chair for the OEA.  Paul Fisher (who is in his late 40's or early 50's) began having a sexual relationship with Carla while she was a student in his accounting class. Paul later married Carla—I don't know Paul's marital status at the time he began having a sexual relationship with Carla.

**Bob Morgan** (2000 to 2005?) was a full-time instructor in the Psychology Department; like Rich Reiner, Bob taught human sexuality courses.  Bob and **RW** (Chair of the Business Department) shared a predilection for pornography (I have no verification of the allegations of child pornography).  While Bob Morgan was "retired" from the College, RW (who openly boasted about his use of pornography to female students in my Technical Writing class) remains Chair of the Business Department.  Bob Morgan used College resources (computers and servers) to download, copy, and distribute pornography.

**Mike Laam** (1997 on) was Chair of the Computer Science Department and Chair of the Sexual Harassment Committee when he began having a sexual relationship with a student, Cheryl.  Both Mike and Cheryl were married at the time, and when Cheryl's husband became suspicious, he called the College President (Harvey Bennett) and filed a complaint.  Mike called off the "affair," but Cheryl ended up divorced and lost custody of her children.  During the time Mike was having a sexual relationship with Cheryl, Mike used Learn & Earn funds to hire Cheryl as a "personal assistant."  Mike later hired Cheryl as a full-time classified staff member in the Computer Science Department.

These are just 12 names from a much longer list of male faculty who used (and continue to use) their positions at the College to prey on and sexually exploit female students and/or female staff members; some of these students were/are under the age of 18.  Any female student or female faculty/staff member who was brave enough to complain about inappropriate sexual conduct by male faculty/staff were either retaliated against by the College or ignored.



*Exhibit A (2)*

*Joki, Julie* *Jerry Bryan = Union President (@ RCC for OEA)*

| | |
|---|---|
| **From:** | Joki, Julie |
| **Sent:** | Monday, September 26, 2005 10:41 AM |
| **To:** | Fisher, Paul |
| **Cc:** | Garry Neil; Bryan, Jerry |
| **Subject:** | RE: Letter? |
| **Importance:** | High |

What do I want, really? I want to be able to come to work at RCC without being harassed by management. I want to be treated as other professionals at this college are treated. I want not to be selected out for slander. I don't want to be called a liar anymore. I want to know that the locks to my building can't be changed on one manager's whim to keep me out. I want to feel secure that doing a good job won't be grounds for punishment. I want management to adhere to the contract. I don't want managers to feel free to invent contract language when faculty don't seem to break the rules as they now exist. I want Cindy and Galyn reprimanded and censured for the way they have treated me over the years. I want to know that my associate dean cannot tell me how to dress or whether or not I need to shave my armpits. I want my good name restored. I want to, after 13 years of exemplary service, to be able to get another job at another institution without having to explain why, according to my personnel record, I neglected my duties, took off without notice, can't get along with anyone; act without thinking; abandon my students.

That's what I want. I want all of the damage that Galyn and Cindy have done to me, both personally and professionally, gone. I want a public apology. I want Peter to follow-through on his promises from last year. I want someone--almost anyone at this point in time--to watch the watchers--how is it that managers like Cindy and Galyn can even call a meeting like the one last Wednesday and accuse me of violating non-existent contract language, threaten my job and job security, and then put all of that into my personnel record? How does that happen? I want to know!

Julie Joki  -

-----Original Message-----
From: Fisher, Paul
Sent: Saturday, September 24, 2005 8:34 AM
To: Joki, Julie
Cc: Garry Neil; Bryan, Jerry
Subject: RE: Letter?

Hi Julie,

I am writing the grievance based on our meeting on Wednesday. I am having a bit of a difficulty in capturing what we want as a resolution. Do you have anything specifically in mind? Here is my list:

1. The letter of September 21, 2005 be purged from all college files. 2. Your evaluation (Julie's) be made by an alternate associate dean because there is a history of poor management practices with Hauser.

Garry,

Is it possible to include Liz McKenna in this? I feel the college has acted in a very disparite manner and I would like someone to review the practices with an eye toward discriminatory practices.

I would like to hear your thoughts.

Thanks,



*Exhibit 5*

October 4, 2005
Lynda Warren
Rogue Community College

Re:    **Level Two Grievance**

**Article 5 - Employee Rights**
**Article 8 - Nondiscrimination**
**Article 11 - Employee Discipline**
**Article 25 - Grievance Procedure**

The Rogue Community College Education Association (RCCEA) initiates a Level II grievance on behalf of **Julie Joki**. On September 21, 2005 the College issued a letter to the Grievant specifically identifying four issues as a basis of this disciplinary action. The Association contends that the events described by the College are fabricated by the administration and are being used in a discriminatory and retaliatory manner.

The College claims that Joki did not call Cindy Hauser, her immediate supervisor. The College's current "matrix management" does not clearly delineate "direct supervisors". The College argues that there is no question that Hauser is Joki's supervisor but there are numerous examples where that relationship is blurred. Further there has been not controversy about whether Joki contacted the College. A family friend did call and attempt to give the College as much information as possible. The College cites a relatively minor piece of the Collective Bargaining Agreement (CBA) and exponentially creates the image of malfeasance on the part of the Grievant.

In addition, Article 18, cited by the College, does not specify that a faculty member must contact his/her "immediate supervisor" in a family emergency, but simply requires a faculty member to contact "the College" either before (if possible) or after (when reasonable) a family emergency takes the faculty member away from his/her college duties. Grievant did contact the College, at a higher level than her department chair, by contacting the Associate Dean's Office of the Redwood Campus. Under the circumstances, this contact made most sense. Thus, there was no violation of this clause whatsoever.

The College accuses Grievant of Neglect of Duty, stating that classes were "abandoned" and that no assistance or suggestion of how to finish their last week of classes was provided. At no time were classes "abandoned." The classes were assigned to turn in final projects and attendance was not required. This is a common practice throughout the College. There was no neglect of duty by Grievant. On the contrary, due to Grievant's attention to her duty throughout the year, the students were fully prepared to turn in their projects during the last period, scheduled for August 23, 2005, and they did so totally consistent with the curriculum and course outline of classes. There were no other classes to be held during the week Grievant was called away to a family emergency. The projects were graded and the grades were turned in on time, again in complete fulfillment of Grievant's contractual duties. To require the Grievant to adhere to a different standard from that imposed upon and practiced by other faculty constitutes disparate treatment and is both discriminatory and retaliatory.

The Grievant is falsely accused of giving her keys to a student. The Grievant's work keys were always in her possession. At no time did the Grievant allow another person to have



those keys. The College completely fails to support the contention that the keys were given to a friend. While the College alleges the fact that the friend was an RCC student, during the September 21 meeting neither Hauser nor Carlile were able to cite to any proof regarding what classes or even when the friend was a student. The friend in fact was not a current student of Jokie's. Regardless of that fact, however, the keys were never turned over to anyone, but instead remained in the possession of the Grievant the entire time. The administrative rule cited by the College is not readily available or customarily known throughout the College. In any event, it was not violated.

Contrary to the College's allegation, at no time was permission given for the Grievant's friend to enter the Grievant's office or, more importantly, did the friend enter the office during the last week of the summer term. This is another fabrication that the College has failed to support by any credible evidence.

The Association cites four contractual violations:

**Article 5:**   The CBA requires the College to provide access to workspaces. The College by its own action denied the use of the Grievant's office and without her assertiveness, the student grading would not have been accomplished. In this case, Hauser and Carlile were a hindrance to the successful completion of the grievant's responsibilities.

**Article 8:**   The conduct of the College in issuing the reprimand, locking Grievant out of her office and all campus facilities, spreading false statements regarding her alleged conduct and failing to provide her due process constitutes blatant and intentional continuation of the discriminatory and retaliatory actions by Hauser and Carlile. The Grievant was successful in a discrimination charge that was directly related to Hauser and Carlile during the last academic year. At the beginning of the meeting of September 21, 2005, Carlile's first sentences were that this action cannot be taken as discriminatory. These comments demonstrate that the College recognized that this action could be interpreted as discriminatory and retaliatory, and, nevertheless, they decided to move forward with the discipline. The lack of credible substantiation involving the current allegations leaves only the motivation of reprisal for their actions.

**Article 11C:**   At no time in the meeting of September 21, or at any time before or after, did the College substantiate the claims made in the disciplinary letter of September 21. The College's actions violated the Grievant's rights to just cause by failing to allow her either procedural or substantive due process in virtually every aspect of the investigation and imposition of discipline, including but not limited to the following:

a.   The College failed to conduct an adequate investigation, by failing to contact the Grievant or the relevant witnesses regarding the facts, failing to look at the practices of other faculty, failing to properly read and apply its policies, procedures and rules, and failing to give the Grievant adequate notice of the concerns and allegations so that she could provide support at

*Exhibit 6 (2)*

the pre-disciplinary investigative meeting regarding the compelling justification for each and every action she took.

b. The College further failed to apply consistent standards regarding attendance during the last week of classes by instructors. The College failed to apply consistent standards regarding notification of the College during a family emergency. The College failed to provide clear and specific rules related to notification of the College in the case of a family emergency, coverage of classes in case of a family emergency and other rules it is attempting to apply in this case to justify its accusation of "neglect of duty."

c. The College failed to exercise reasonable care in assessing the conduct at the time it imposing discipline, which included attempting to exclude the Grievant from her classroom when she needed to perform duties, spreading false statements implying the Grievant had been discharged, and preparing a letter of reprimand. Each of these and other actions constituted imposition of discipline without just cause.

**Article 11 & 25:**    The capricious and arbitrary actions can only be viewed as some type of reprisal. Last year the Grievant filed a grievance and her position was sustained. This grievance was in part directed at the poor management techniques of both Hauser and Carlile. In this case, the lack of credible evidence and the neglect of proper investigation into the situation surrounding these events lead to the conclusion that there is reasonable cause to believe their actions were retaliatory.

The Association reserves the right to amend this grievance if new information surfaces in the investigation of the events.

**Remedy Sought:**

1. Any and all documents relating to this unfair action be removed from both the personnel file and the working files of the College, including but not limited to the letter or reprimand, the incident report, and any directives to security related to excluding Grievant from her office or other campus facilities.

2. Issue a letter of apology for the rash and unjustified rush to judgment regarding the events leading up to the letter of reprimand.

3. The College protect the grievant by:

   a. Having the Grievant's intensive evaluation be completed by a different Associate Dean;

   b. Having the Grievant report to a different Associate Dean for all purposes related to supervision, evaluation and any other level of control which would allow an opportunity for retaliation; and/or

Exhibit 6 (3)

    c.  Moving the Humanities department coordination responsibilities to a different Associate Dean and a different Dean.

4.    Any and all further actions necessary to stop the retaliation and discriminatory actions being taken against Grievant by the College

Paul Fisher
RCCEA Grievance Chair

Exhibit 6(4)

COPY

September 21, 2005

Julie Joki
1030 SE Belleaire
Grants Pass, OR 97526

*Draft Only*

*Why did Peter get a "draft" of this letter and when did he receive it?*

Dear Julie

This letter will be placed in your personnel file and considered a Letter of Reprimand. In view of the events during the last week of summer term, specifically August 23-25, 2005, you have violated the following Articles of the collective bargaining agreement and college administrative policy.

Specifically, the issues for which you violated the bargaining agreement and college policy are:

1. You did not call your immediate supervisor, Cindy Hauser, to inform her that you had a family emergency and would not be attending the last three days of classes during summer term. Instead, you had a friend call a secretary on the Redwood Campus to give that message. (Article 18 Paid Leaves, Section B. 3)

2. In effect, you "abandoned" your classes with no assistance or suggestion of how students could finish their last week of classes and the work involved. (Article 10 Status of Employees, Section D. 2. b. (3) Neglect of Duty)

?3. You gave your building keys to a friend who we later learned was an RCC student in Spring 2005, which permitted access to an RCC building, breaching the security of an RCC facility. (Administrative Policy GI-038, "Keys/Key Cards Responsibility and Control")

?4. You gave permission to a person not employed at the college to go into your office and retrieve student papers, a direct violation of student privacy regulations. (FERPA)

5. You are required to submit a written explanation of the emergency to the college as soon as reasonably possible before or after the leave taken. To date, you have not submitted this or a Leave Request Form. (Article 18 Paid Leaves, B.5)

*Not included in Julie's letter as per Julie*

It was very difficult for the college to provide appropriate assistance and direction to your students without prior knowledge that you would not be on campus for the last three days of summer term. While we are not discounting your sense of urgency, you have a professional obligation to insure that your students receive appropriate and professional instruction and guidance, particularly during the last week of a term. By not making any prior arrangements, you left your students without direction and support and the college in the position of having to do its best to expedite the completion of the students' work.

Additional incidents of this kind will be cause for more severe disciplinary action, up to and including, suspension and dismissal.

*Exhibit 6(5)*

A copy of this letter will be placed in your Personnel file. Please acknowledge receipt of this reprimand below. If you wish, you may attach a written statement or additional documents to this reprimand which will be attached to this document in your file.

Galyn Carlile, PhD
Executive Dean and Chief Academic Officer

c    Cindy Hauser
     Lynda Warren
     Marilyn Mills-Uribe
     Jerry Bryan

_____
Julie Joki


_____
Date

*Exhibit 6 (6)*

November 17, 2005
Peter Angstadt, PhD
Rogue Community College

RE:     Level II Grievance Julie Joki

Article 25 - Time Limit Extension

The Rogue Community College Education Association (RCCEA) agrees to a time extension in this instance. The purpose of this extension is to provide the College with adequate time to repair the damage caused by actions leading up to and including the reprimand issued on September 21, 2005. Those actions resulted in a grievance being filed. As a remedy the RCCEA requested the College take five actions. It is understood that the first remedy, removal of documents from the grievant personnel file, has been accomplished. The remaining four items are more difficult for the College to accomplish which creates the need for this extension.

Overall, the resolution of this grievance requires a clearer plan. Specifically who will be responsible for Joki's evaluation and work assignment and how will the departmental responsibilities be changed.  It is also important to have completion dates identified to assist in monitoring this resolution. Also, Ms. Joki needs a clearer commitment to no retaliation in the future. I have discussed the specific remedies so that what we are requesting it clear.

**Remedy #2**
*Issue a letter of apology for the rash and unjustified rush to judgment regarding the events leading up to the letter of reprimand.*

The College has not indicated if this remedy will be forth coming.

**Remedy #3**
a.  *Having the Grievant's intensive evaluation be completed by a different Associate Dean.*

We believe that Cindy Hauser has already sent communication that she would probably not be completing this process.  However, it is important to have a written communication from you to Julie with a copy to Cindy stating that the intensive evaluation process has been reassigned and the name of the new Associate Dean or Dean who will be in charge.  Since it appears that decision has been made, is there some reason that notification cannot be reduced to writing and attached to your grievance response?

b.  *Having the Grievant report to a different Associate Dean for all purposes related to supervision, evaluation and any other level of control which would allow an opportunity for retaliation.*

In the meeting and subsequent discussions you have indicated that any performance action against Julie would have to go through you, that is

*Exhibit 7(1)*

have your approval. This would not, however, prevent a repetition of the events which gave rise to this grievance, except that the letter would not have been approved. The offensive actions, however, which led up to the letter are of major concern. If anything similar was repeated, Julie would have an even stronger claim of retaliation and the college would be extremely vulnerable and likely found liable. Thus, we are asking that the reassignment of all supervision of Julie take place immediately. It should be in effect at least until the remedy under 3.c. is carried out and we are asking that Julie be assured she will not be placed in a reporting relationship (direct or indirect) under Cindy Hauser or Galyn Carlile for the remainder of her service at Rogue Community College. This would provide a clear message to Julie that she is insulated from retaliation and it would also protect the college. We have shared with you the tort claims notice that is ready to file. The very essence of that notice is the College's failure to take sufficient actions to correct the past and prevent such conduct in the future. The law requires such a response. If it does not appear in the remedy to the grievance, Julie will have no choice but to file the notice.

c.     *Moving the Humanities department coordination responsibilities to a different Associate Dean and a different Dean.*

During discussions, some solutions have been suggested verbally so that Julie Joki is not isolated by the reassignment and therefore further penalized as a result of the necessary change. We believe this proposed remedy is the safest route for the college. You have also indicated that there are other good reasons for making these reorganizational changes. We are willing to give you time to accomplish this in an orderly fashion, but request that it be completed no later than February 1. The date specifies both a reasonable amount of time, as well as the time by which Ms. Joki needs to make a decision as to whether she will file the tort claims notice.

## Remedy #4
*Any and all further actions necessary to stop the retaliation and discriminatory actions being taken against Grievant by the College.*

While this remedy is essentially protective for the grievant, the remedy also protects the college from further claims. It is intended to require the College to outline a concise plan on the steps the College will initiate in order to maintain a non-hostile working environment. A major concern for the RCCEA is the fact that guarantees were given in a previous settlement and it is apparent that those guarantees were not sufficient to prevent this questionable action by the College.



*Exhibit 7(2)*

**Remedy # 5**
*The College and its administrators commit to no further retaliation against the Grievant for exercising her rights under the Collective Bargaining Agreement.*

The RCCEA is requesting the College reaffirm its strong commitment to no retaliation against Ms. Joki evidenced in its policy. This policy is grounded in Board Policy and contractual language. College operations should be clearly supportive of these policies and possible violations should be thoroughly investigated.

With these remedies in mind and in an effort to create a good and lasting solution, the RCCEA agrees to an extension until December 15, 2005.


Paul Fisher
Grievance Chair

Exhibit 7(3)

# DRAFT

January 13, 2006

Julie Joki
Instructor
Rogue Community College

Dear Julie,

I am writing this letter as a follow-up to our conversation on Monday, October 31. At this meeting I gave you my conclusions on the Level II grievance filed by you and Paul Fisher in response to the September 21, 2005 letter of reprimand you received from Dean Galyn Carlile.

Based on the information I reviewed of the circumstances involved, I concluded the letter is to be withdrawn from your file. This has been done.

My commitment to you is that over the next months I will be making changes in the organizational structure of Rogue Community College. My target is to complete this reorganization by the new fiscal year which is July 1, 2006. While all of the details are not in place, I agree that you will not be assigned to a workgroup that is supervised by Cindy Hauser or Dean Galyn Carlile.

The grievance also requests that your intensive evaluation be completed by a different Associate Dean. Mike Laam will be the Associate Dean completing your evaluation this year. I have also asked Mike to act as your contact for day-to-day workplace communications including absences. While I certainly have no reason to believe there will be any need for disciplinary action, should such action be proposed for any reason, all such disciplinary actions toward you will be reviewed by me and only implemented with my approval. My goal is to assure you that Rogue Community College is a safe, harassment-free place for you to work.

I also want to assure you that College policy and I do not permit retaliatory or discriminatory actions by any employee of the College. I have spoken with the two individuals you believe engaged in such behavior and reiterated the policy that sanctions will be imposed on any employee that engages in these illegal activities.

If any of these conditions are not met, you should request the Association to file a Level II grievance documenting the remedies that you think are fair and reasonable. My hope is that while we cannot forget the events of last summer, we can move forward in a positive manner for the benefit of the College.

Sincerely,

Peter Angstadt, Ph. D.
President

Exhibit 8

01-077

**Liz McKanna**

From:
Sent:        Fisher, Paul [PFisher@roguecc.edu]
To:          Thursday, August 24, 2006 8:16 AM
Subject:     Liz McKanna
             FW: Looking forward

Looking Forward
08.23.06.doc (...

Hi Liz,

I hope this finds you well. I am writing as a heads up and for some direction in regards to Julie Jokie. As you know our understanding was that she was not to work under G. Carlyle and C. Hauser. A reorganization and Nancy Maxwell is now the Dean of Instruction and therefore Carlyle is out of the picture. However there does not appear to be a change in the reporting lines between Julie and Cindy Hauser. I do not think this will be acceptable to Julie.

I have attached N. Maxwell's memo to us announcing responsibilities. It is below, but the formatting is messed up.

Any ideas?

Thanks,

Paul

-----Original Message-----
From: Fisher, Paul
Sent: Thursday, August 24, 2006 4:47 AM
To: Angstadt, Peter
Subject: FW: Looking forward

Hi Peter,

I am concerned about the continued assignment of humanities to C. Hauser. In particular in regards to Julie Joki. Last fall we worked on an agreement that would have taken Julie out of Hauser's sphere of influence. In fact we had M. Lamm act as Joki's direct supervisor. Is your intention to continue this plan in this manner?

In partial settlement of that agreement the College agreed to address this issue during the summer reorganization. It appears that the workplace protection of Joki was not addressed. I think this oversight will cause some type of litigation and if we can affirmatively respond now we can prevent that litigation.

Thanks,

Paul

-----Original Message-----
From: Maxwell, Nancy
Sent: Wed 8/23/2006 2:09 PM
To: Instructional Full-Time Faculty; Dev Ed Dept; Goulding, Priscilla; Vaughn, Nancy
Cc: Associate Deans; Executive Team; Smith, Sharon
Subject: Looking forward

As many of you are finishing up summer quarter with our students and others are beginning to think about the upcoming Fall quarter and 2006-07 year, we are busy preparing for the year as well.


Exhibit 9

October 5, 2006

Rogue Community College

RE:    Resignation of Julie M. Joki

Greetings:

Please consider this letter my formal resignation as a full-time faculty member of the Humanities Department at Rogue Community College. I am resigning as of October 6, 2006.

I regret that I must leave my position before the end of this current contract period, but I feel that I have no other options open to me. In two previous instances when I have needed to take leave due to family circumstances, I have been threatened with my job, harassed, locked out of my office, etc. I will never again subject myself to such treatment, so I am resigning.

I request that RCC begin immediate processing of my termination. In the event that I am unavailable and RCC requires any signatures by me in order to expedite this processing, I have authorized my son, Tyler R. Joki (via a Power of Attorney), to act in my stead and sign any such documentation.

As regards copyright issues and the Rogue OWL, I forbid RCC to assume any form of ownership of my intellectual property. I wrote the OWL on my own time without compensation from RCC. The majority of content on the OWL was produced by me prior to my employment at RCC, and I own it. I will fie a suit for copyright infringement if RCC attempts to in any way usurp my ownership of my own material. RCC may not sell or publish the content on the OWL without first compensating me fairly; this includes compensation for the conceptualization as well as interface and functionality as the OWL interacts with users on the web. I claim proprietary rights to the concept, design, content, and functionality, as well as the layout and user interface.

I have been honored to instruct some of the most hard-working, intelligent students in southern Oregon; and for this privilege, I am grateful. It's unfortunate that I have had to subject myself to both personal and professional debasement in order to carry out my job. But, that's RCC's issue now, not mine.

I resign now; I will not be returning to RCC as an instructor.

Good-bye,

Julie Joki
You favorite Rogue Teacher......

*Exhibit 10*