**Robert E. Franz, Jr.    OSB #73091**
E-Mail: rfranz@franzlaw.comcastbiz.net
**Elizabeth S. Moseley    OSB #09589**
E-Mail: rfranz@franzlaw.comcastbiz.net
LAW OFFICE OF ROBERT E. FRANZ, JR.
P.O. Box 62
Springfield, OR 97477
Telephone: (541) 741-8220
Facsimile: (541) 741-8234
  Of Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| **Julie M. Joki,** | Case No. 08-849-CL |
| Plaintiff, | |
| v. | **Concise Statement of Material Facts** in Support of Motion for Summary Judgment by Defendant Peter Angstadt |
| **Rogue Community College; Dr. Peter Angstadt**, President Of Rogue Community College; **Denise Swafford; Cindy Hauser; Verne Underwood; Michael Laam;** and **Galyn Carlile;** | |
| Defendants. | |

Page 1  -  Concise Statement of Material Facts by Defendant Peter Angstadt

COMES NOW Defendant Angstadt, by and through his attorneys, the Law Office of Robert E. Franz, Jr., and hereby submits his Concise Statement of Material Facts in Support of his Motion for Summary Judgment. The plaintiff has alleged that she was discriminated against by Rogue Community College (RCC) and six named defendants who also worked at RCC. The plaintiff's allegations span over a decade and are extensive; the facts relevant to Defendant Angstadt's Motion for Summary Judgment are as follows:

1.      In the summer of 1994, the plaintiff applied for a writing instructor position with RCC. (Ex. 501: 1994 Application for Employment). In September of 1994, the plaintiff began working as a part-time faculty member for the Humanities Department at RCC. (Ex. 502: Deposition of Joki, p. 55:6-8; Ex. 503: Part-Time Contract, dated September 16, 1994).

2.      In the summer of 1997, the plaintiff applied for a full time Literature & Composition Instructor position, and was hired as full time faculty. (Ex. 504: 1997 Application for Employment; Ex. 505: Letter from Dean of Human Resources). She continued to work at RCC, until she abruptly resigned on October 5, 2006, in the middle of a term. (Ex. 506: Plaintiff's Resignation Letter).

3.      Defendant Angstadt was appointed as the president of RCC in June 2004. (Ex. 507: Deposition of Angstadt, p. 8:2-6; Ex. 508: Resolution No. P85-03/04).

4.      Defendant Angstadt did not have much involvement with the plaintiff, other than the typical interaction he had with faculty members. (Ex. 507: Deposition of Angstadt, p. 8:7-24, p. 34:2-9). He would occasionally see her come through the office, pass by on campus, and would sometimes talk about her family or projects she was working on. (*Id.*, p. 34:2-9).

5.     The one occurrence with the plaintiff that Defendant Angstadt, was involved in, however, was concluding the plaintiff's Level II Grievance. (*Id.*, p. 10:8-14; Ex. 509:  Letter to Plaintiff from Peter Angstadt).

6.     The Level II Grievance was initiated by the plaintiff to resolve complaints she had surrounding leave that she took in August 2005. (Ex. 517: Level II Grievance).

7.     In the early morning of Tuesday, August 23, 2005, the plaintiff abruptly left town for what she later stated was a family emergency. (Ex. 516: Association's Sequence of Events; Ex. 510:  Leave Request Form; Ex. 518: Conversation Document, p. 1; Ex. 519: Fact Finding, p. 1).

8.     RCC became aware of the absence later that morning, when Judy Cellars, the secretary to Mike Laam, was called by a woman who identified herself as Shannon Rigsby. (Ex. 518: Conversation Documents, pp. 1-2; Ex. 519:  Fact Finding, pp. 1-2).

9.     Ms. Rigsby told Ms. Cellars, that the plaintiff had to leave town, that the papers from her students needed to be picked up, and that she, Ms. Rigsby, had the plaintiff's keys and would pick up the papers. (Ex. 511:  Incident Report, Ex. 518:  Conversation Document, pp. 1-2; Ex. 519:  Fact Finding, pp. 1-2).

10.     The week of August 23, 2005, was the last week of classes that term. (Ex. 519: Fact Finding, p. 4).  Plaintiff was scheduled to teach classes on August 23-25, 2005, including morning classes on August 23. (Ex. 513:  Letter of Reprimand).  However, the plaintiff left no coverage instructions nor did she arrange for substitutes. (Ex. 519:  Fact Finding, p. 1).  RCC was left to try to find last minute coverage for the classes. Ms. Cellars, Defendant Laam's secretary, went to the plaintiff's first class scheduled on Tuesday morning herself. (Ex. 518: Conversation Document, p. 2; Ex. 519:  Fact Finding, p. 2).

11.    Even though the plaintiff later submitted a statement stating she intended to cancel her last class, the students stated otherwise. (Ex 521: Emails regarding Plaintiff's 2005 Absence, p. 1). One student stated he had a presentation to give. Other students stated they needed help editing their final papers. Another student commented, "Oh, Julie's not here again." (*Id*.). Several students stated that it was not unusual for the plaintiff to miss student presentations. (*Id*.).

12.    Donna Hanson came to cover the plaintiff's later class. (Ex. 519: Fact Finding, p. 2).

13.    After Ms. Cellars informed Defendant Laam of the situation, he contacted Defendant Hauser, the plaintiff's supervisor, to relay the information. (Ex. 522: Deposition of Laam, pp. 37:24-38:4). He informed her that, the plaintiff had left town, and that there was no instructor to meet with students. (Ex. 523: Deposition of Hauser, p. 72:2-20). Defendant Laam, explained that a woman contacted his secretary, Judy Cellars, and told his secretary that 1) plaintiff had left town, 2) that the woman had plaintiff's keys, 3) that papers should be collected from the plaintiff's students, and 4) that the women would come by and collect the papers. (*Id*.).

14.    In order to figure out more information, Defendant Hauser instructed Ms. Cellars to call the woman back to inquire whether the plaintiff would be back in town in time to submit grades and to figure out who the woman was. (*Id*., pp. 72:20-73:15). Ms. Cellars, in turn, relayed to Defendant Hauser that she contacted the woman again, she identified herself as a friend of the plaintiff's, and she believed the plaintiff would be back over the weekend in time to grade the papers. (*Id*.).

15.    Defendant Hauser also attempted to get in touch with the plaintiff. On August 23, 2005, Defendant Hauser left a message on the plaintiff's home phone to try to determine what was happening. (Ex. 521: Emails regarding Plaintiff's 2005

absence, p. 2). Defendant Hauser explained to the plaintiff on the message, that her friend would be unable to retrieve the plaintiff's papers due to FERPA regulations. (*Id.*).

16.    Since the security of RCC and student privacy policies were potentially being violated, Defendant Hauser contacted Bart Van Syoc with Redwood Campus Security to apprise him of the situation. (Ex. 523:  Deposition of Hauser, p. 73:7-24).  He informed Defendant Hauser that since a non-RCC employee apparently had access to the building, he would have to change the plaintiff's access code. (*Id.*).  He informed Defendant Hauser, the plaintiff would just have to come to plant service to gain access when she returned.  (*Id.*).

17.    Defendant Hauser did not request that the plaintiff be locked out and not let back in until she (Hauser) gave maintenance permission.  Rather, Defendant Hauser left the security issue up to Van Syoc to handle in the manner he believed was necessary to secure the campus.  (*Id.*, p. 74:15-75:2).

18.    On August 23, 2005, Defendant Hauser filed an Incident Report regarding the circumstances around the plaintiff's absence.  The Incident Report stated:

> "A friend of Julie's, Shannon, called Judy Cellars to say that Julie was on her way to California because of a family emergency.  Shannon indicated Julie had given her a key to Julie's office and that she would pick up student papers in Julie's office.  Upon further checking, it was determined that Shannon does have Julie's badge and code to get into the building plus Julie's office key.  When asked when she planned to pick up the papers, Shannon stated it would probably be Friday, a day the college is closed.  Bart has advised this has compromised the integrity of the security system and record keeping system in place to protect RCC's property.
>
> * * *

Because of FERPA regulations, no student papers will be turned over to this individual. Security has been alerted that if this individual is seen at Q Building, the badge and key will be confiscated." (Ex. 511: Incident Report).

19.    The plaintiff returned to campus on Sunday, August 28, 2005. (Ex. 520: Timeline Prepared by Plaintiff).

20.    Since the plaintiff could not access her building, she contacted Campus Services. (*Id.*). John Plant spoke to the plaintiff when she arrived to Campus Services. (Ex. 519: Fact Finding, p. 3).

21.    Mr. Plant called his supervisor, Bart Van Syoc, to let the plaintiff speak to him. (*Id.*). After speaking to Van Syoc, Mr. Plant immediately gave the plaintiff access to enter the building. (*Id.*). Mr. Plant went over to the plaintiff's building to let her in. (*Id.*). He stayed while she was there to ensure the building got re-secured, and to see if she needed help carrying anything. (*Id.*).

22.    Defendant Hauser followed up with the plaintiff the next week to find out what happened. (Ex. 523: Deposition of Hauser, p. 75:4-14). When she reached the plaintiff, the plaintiff explained what happened, and Defendant Hauser told her that they needed to talk more about it since she left without the classes being covered. (*Id.*). However, since it was the end of the term, Defendant Hauser said they would address it the next term. (*Id.*).

23.    Defendant Hauser informed Defendant Carlile, the Dean of Instruction, about the incident because of the seriousness of the matter. (Ex. 523: Deposition of Hauser, pp. 76:17-77:2).

24.    Among other things, Defendant Carlile and Defendant Hauser were both concerned about FERPA issues and the plaintiff's departure. (Ex. 524: Deposition of Carlile, p. 25:4-15; Ex. 523: Deposition of Hauser: p. 94:2-13).

25.     The Family Educational Rights and Privacy Act (FERPA) prohibits the disclosure of education records (or personally identifiable information contained therein other than directory information) without written consent. 20 U.S.C.A. § 1232g (b).

26.     Defendants Carlile and Hauser decided the proper action to take as a result of the incident would be to issue a Letter of Reprimand.  (Deposition of Hauser, p. 79:11-17; Ex. 524:  Deposition of Carlile, p. 43:10-12).

27.     On September 13, 2005, Defendant Carlile, informed the plaintiff that a meeting was going to be held on September 21, 2005, about her absence and that she was allowed to bring union representation.  (Ex 512:  Letter to Plaintiff from Defendant Carlile).  At the meeting a letter of reprimand was issued to the plaintiff, and it set out four violations of the Collective Bargaining Agreement and College Administrative Policy.  (Ex. 513:  Letter of Reprimand).  Specifically the letter set out:

"1.     [The Plaintiff] did not call [her] immediate supervisor, Cindy Hauser, to inform her that [plaintiff] had a family emergency and would not be attending the last three days of classes during summer term. Instead, [plaintiff] had a friend call a secretary on the Redwood Campus to give that message. (Article 18 Paid Leaves, Section B. 3)

2.     In effect, [plaintiff] "abandoned" [her] classes with no assistance or suggestion of how students could finish their last week of classes and the work involved. (Article 10 Status of Employees, Section D.2.b (3) Neglect of Duty)

3.     [Plaintiff] gave [her] building keys to a friend who [the College] later learned was an RCC student in Spring 2005, which permitted access to an RCC building, breaching the security of an RCC facility. (Administrative Policy GI-038, "Keys/Key Cards Responsibility and Control")

4.    [Plaintiff] gave permission to a person not employed at the college to go into [her] office and retrieve student papers, a direct violation of student privacy regulations. (FERPA)."

28.    Administrative Policy GI-038, "Keys/Key Cards" requires that individuals issued a key/keycards "shall not loan their key/keycard(s) to others"; that "Key/keycards issued to employees should not be used to provide access to buildings for other employees or students or community members except within authority assigned to key/keycard-holder by the College." (Ex. 514: General Information and Administrative Procedures: Keys/Key Cards).

29.    Article 10 of the Collective Bargaining Agreement states a regular member can be subject to dismissal for "Neglect of duty." (Ex. 515: Excerpts of Collective Bargaining Agreement, p. 36).

30.    Article 18 of the Collective Bargaining Agreement states:

"A member electing to take contract leave must notify the College, in writing, as soon as possible prior to the leave, of the date and reason for the leave taken, but in no event any less than two (2) days in advance of the leave taken; provided, however, leave taken for personal emergency under b.(1) above shall, with an explanation of the emergency, be communicated in writing to the College as soon as reasonably possible before or after the leave taken." (*Id.*, pp. 64-65).

31.    In response to the Letter of Reprimand, a Level II Grievance was initiated on behalf of the plaintiff on October 4, 2005. (Ex. 517: Level II Grievance). Jerry Bryan and Lynda Warren were appointed as neutral fact finders to investigate the incident. (Ex. 518: Conversation Document). Interviews of all involved, except for the plaintiff who refused, were conducted in early October of 2005. (*Id.*).

32.    Peter Angstadt, RCC President, became involved since it was a Level II Grievance. (Ex. 507: Deposition Angstadt, p. 12:8-15). His objective in handling a Level II Grievance was to resolve the situation, and get everyone

involved to move forward. He was not attempting to assign fault. (Ex. 507: Deposition Angstadt, p. 30:17-20; Affidavit of Angstadt).

33.    Defendant Angstadt resolved the Grievance by withdrawing the Letter of Reprimand from the plaintiff's file, and by assigning Defendant Laam to be the plaintiff's supervisor. (Ex. 509: Letter to Plaintiff from Peter Angstadt).

34.    The letter stated, in part, that:

"Over the next several months I will be seeking out suggestions to enhance the organizational structure at Rogue Community College. My target is to complete any needed changes by the new fiscal year which is July 1, 2006. At that time I will carefully evaluate your proposal to have your area moved under different supervision.

The grievance also requests your intensive evaluation be completed by a different Associate Dean. Mike Laam will be the Associate Dean completing your evaluation this year. I have also asked Mike to act as your contact for day-to-day workplace communications including absences. While I certainly have no reason to believe there will be any need for disciplinary action, should such action be proposed for any reason, all such disciplinary actions toward you will be reviewed by me and only implemented with my approval. My goal is to assure you Rogue Community College is a safe, harassment-free place for you to work.

I also want to assure you college policy and I do not permit retaliatory or discriminatory actions by any employee of the College. I have emphasized to everyone involved with this issue that retaliatory or discriminatory actions will not be tolerated in any manner.

If any of these conditions are not met, you should request the Association to file a Level II grievance documenting the remedies you think are fair and reasonable. My hope is, while we cannot forget the events of last summer, we can move forward in a positive manner for the benefit of the College." (Ex. 509: Letter to Plaintiff from Peter Angstadt).

35.    Defendant Angstadt explained in his deposition that the language regarding retaliation was put in because he recalled the plaintiff and her grievance

chair were concerned about retaliation. (Ex. 507:  Deposition of Angstadt, p. 13:20-23).

36.    He believed the mechanism he put in place would prevent any potential retaliation. (Ex. 507:  Deposition Angstadt, p. 11:1-18).

37.    The letter emphasized that the plaintiff could notify Defendant Angstadt, the president of RCC, directly if she felt any discriminatory or retaliatory actions were being taken against her. (Ex. 509; Ex. 507:  Deposition of Angstadt, pp. 12:25-13:6).

38.    The plaintiff never contacted Defendant Angstadt even though Defendant Angstadt clearly set out procedure for her to follow if she felt harassed or discriminated against. (Ex. 507:  Deposition of Angstadt, p. 11:4-15).

39.    In an email with the plaintiff's grievance chair, Paul Fisher, approximately a month before the plaintiff resigned, Defendant Angstadt explicitly asked whether the plaintiff "feels she is being mistreated or harassed." (Ex. 526:  Email correspondence between Fisher and Angstadt; Ex. 525:  Deposition of Paul Fisher:  p. 9:4-11:12 (explaining Fisher's role as the plaintiff's grievance chair).

40.    Paul Fisher never responded that the plaintiff felt mistreated. (Ex. 525:  Deposition of Fisher, pp. 46:9-47:5 (explaining that no correspondence occurred outside of that submitted as Exhibit 526); Ex. 526:  Email correspondence between Fisher and Angstadt).

41.    Besides resolving the Level II Grievance, Defendant Angstadt did not have much interaction with the plaintiff. (Affidavit of Angstadt).

42.    The plaintiff abruptly resigned on October 5, 2006, during the middle of her contract, and during the middle of a term. (Ex. 506:  Plaintiff's Resignation Letter).

43.    Defendant Angstadt learned she had left the College when he received an email the plaintiff had sent to all of RCC. (Ex. 507: Deposition of Angstadt, pp. 40:23-41:21).

44.    Defendant Angstadt was surprised when she left. (Ex. 507: Deposition of Angstadt, p. 41:11-12).

45.    Defendant Angstadt did not speak to Denise Swafford about the plaintiff's resignation around that time, nor did he have any input in Denise Swafford's decision to request a welfare check on the plaintiff after she left RCC. (*Id.*, pp. 40:23-41:21).

46.    In fact, when Denise Sawford called about a welfare check, Defendant Angstadt was not even in the office. (Ex. 527: Deposition Denise Swafford, p. 19:10-20).

47.    After resigning from RCC, The plaintiff filed her BOLI and EEOC case on August 1, 2007. (Ex. 528). The plaintiff filed this complaint on July 18, 2008.

DATED:  Wednesday, August 24, 2011.


Respectfully submitted,


By:   _____
LAW OFFICE OF ROBERT E. FRANZ, JR.
**Robert E. Franz, Jr.**
OSB #73091
(541) 741-8220

**Of Attorneys for Defendants**

CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing CONCISE STATEMENT OF
MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY
DEFENDANT PETER ANGSTADT on Plaintiff on Tuesday, August 30, 2011, by
notice of electronic filing using the CM/ECF System:

> Ms. Marianne Dugan
> Attorney at Law
> 259 E. 5th Avenue, Suite 200-D
> Eugene, OR  97401
>   Of Attorneys for Plaintiff
>
> Ms. Shawn M. Dickey
> Attorney at Law
> 4380 Southwest Macadam, Ste. 590
> Portland, OR 97239
>   Of Attorneys for Plaintiff

Dated:  Tuesday, August 30, 2011.

> LAW OFFICE OF ROBERT E. FRANZ, JR.
> Robert E. Franz, Jr.          OSB #73091
> P.O. Box 62
> Springfield, Oregon 97477
> E-Mail: rfranz@franzlaw.comcastbiz.net
> Telephone: (541) 741-8220
>   Of Attorneys for Defendants

I hereby certify that this
document is a true and
correct copy of the original.

_____
Robert E. Franz, Jr.