IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

JULIE M. JOKI,

No. 1:08-cv-849-PA

Plaintiff,

v.                                  **OPINION AND ORDER**

ROGUE COMMUNITY COLLEGE, et al.,

Defendants.

**PANNER, J.**

Plaintiff Julie Joki, a former instructor at defendant Rogue

Community College, brings claims for gender discrimination and

retaliation; violation of the Oregon public employee whistle-

blower statute; and violation of equal protection rights under 42

U.S.C. § 1983.[1]

_____

[1] Plaintiff withdraws her claims for battery, defamation,
and intentional infliction of emotional distress, and her claims
against the individual defendants except for the equal protection
claims under 42 U.S.C. § 1983.

1 - OPINION AND ORDER

Because plaintiff's claims are not timely, I grant

defendants' motions for summary judgment.

## BACKGROUND

Plaintiff began working at defendant Rogue Community College

in 1994 as a part-time instructor of writing and public speaking.

Plaintiff became a full-time instructor of literature and

composition in 1997. She resigned in 2006. Plaintiff claims her

resignation was a constructive discharge caused by intolerable

working conditions.

Because of the applicable statutes of limitation, I focus on

events after July 17, 2006. As plaintiff notes, because she "did

not work during the summer term [of 2006], . . . there was only a

small period of time that was within the limitations period."

Pl. Suppl. Br. 4.

## I. Plaintiff's Workload

Plaintiff alleges ongoing discrimination in her workload and

the failure to assign her literature classes.

### A. Amount of Work Assigned to Plaintiff

Plaintiff claims she received more onerous workloads than

male faculty members. It is undisputed that plaintiff taught

fewer classes from 2000-01 to 2005-06 than any other full-time

faculty member in her department. Defs. Concise Stmt. ¶¶ 34, 35.

During those years, plaintiff taught a total of 94 credits, while

four male instructors taught 168 credits; 228 credits; 240

credits; and 246 credits. Id.

Plaintiff acknowledges the accuracy of defendants' numbers,

2 - OPINION AND ORDER

but contends she was relieved from teaching courses "only so that [she] could carry out other duties necessary for a college writing program. Those other duties often added up to far more work than the actual classes would have been." Pl. Decl. ¶ 32.

Plaintiff taught no classes in 2001-02 and 2002-03 while she worked on the Online Writing Lab. In 2003-04, plaintiff taught nine classes.

For the academic year 2004-05, plaintiff was scheduled to receive the standard Humanities Department workload of five classes per term. In July 2004, plaintiff told defendant Verne Underwood, Chair of the Humanities Department, that her workload for the next academic year was unfair. This was the first time plaintiff complained about her workload.

In August 2004, plaintiff met with defendants Underwood; Cindy Hauser, Associate Dean of the Humanities Department and then plaintiff's direct supervisor; Michael Laam, then Associate Dean of Instructional Services; and Galyn Carlile, an administrator who worked directly under the President of the College. In an attempt to resolve plaintiff's concerns about her workload, the Humanities Department assigned plaintiff to be the coordinator for the Writing Proficiency Exam, replacing Rick Williams, who had been already been given the position. Plaintiff received four course releases for working as the coordinator, although Williams had received only one course release during the previous academic year for the same role.

In January 2006, defendant Peter Angstadt, President of the

3 - OPINION AND ORDER

College, assigned Michael Laam to replace Cindy Hauser as
plaintiff's immediate supervisor. Laam, who was not in the
Humanities Department, had previously gotten along with
plaintiff.

In May 2006, Laam emailed Underwood and Hauser about
plaintiff's course load for the 2006-07 academic year:

> I'm not familiar with a Humanities workload, but should
> it not be 15 ILU's?  I'm thinking that with only four
> classes at 3 credits each that comes to 12
> credits/ILU's??  Then we have preps and other minor
> considerations I know nothing about.  Regardless, my
> first inclination was to assign [plaintiff] what we'd
> assign anyone in the department then work down if
> necessary.

Pl. Ex. 13, at 1.  Laam intended to assign plaintiff the standard
course load for an instructor in the Humanities Department.  For
fall 2006, plaintiff was assigned two speech classes, two
sections of Writing 121, and one section of Writing 122, for a
total of fifteen credits.  Plaintiff emailed defendant Underwood
that her workload for the 2006-07 academic year "looks good
except for that WR 121 [scheduled for spring 2007]."  Moseley
Aff., Ex. 622, at 10.

## B.  Failure to Assign Plaintiff Literature Classes

Plaintiff claims defendants discriminated by failing to
assign literature courses to her.  When the Humanities Department
offered plaintiff a choice between a writing or a humanities
class, however, plaintiff usually chose  writing classes.

In March 2004, defendant Underwood emailed the Humanities
Department a list of available classes for the summer term.

4 - OPINION AND ORDER

Plaintiff chose one speech class and three writing classes.

In December 2004, after plaintiff complained about her course load, Underwood offered plaintiff a choice of writing classes, humanities classes, or an American literature courses. Plaintiff chose the writing classes. She states now that the literature class would not have worked with her schedule.

In 2006 plaintiff told Laam that she wanted to teach writing courses, where she excelled as an instructor. Plaintiff suggested creating a separate writing department where she could teach all the writing classes. Plaintiff states now that she sought a separate writing department to avoid defendants Hauser and Carlile.

Plaintiff states she focused on writing and not literature courses because "I did not anticipate that I would be permitted to teach any literature. Because I do love to teach writing, and I wanted to keep my job, I presented goals that I knew would be considered 'acceptable.'" Pl. Dec. ¶ 42.

## II.  Alleged Incidents of Discrimination After July 2006

### A.  Underwood

On September 24, 2006, plaintiff attended a staff meeting of the Humanities Department. Defendant Underwood, head of the department, was present.

Theresa Van Ravenhorst, one of plaintiff's colleagues, states that after the meeting ended, some faculty members "remained in the room to chat. Ms. Joki approached Mr. Underwood with questions about the Criterion automated writing program. .

5 - OPINION AND ORDER

. . . Ms. Joki . . . needed to know details of the
implementation, because the program would affect her students in
the academic year that was underway.  Mr. Underwood did not
respond to Ms. Joki's question.  He turned his back on her and
left the room."  Van Ravenhorst Decl. ¶¶ 5, 6.

Plaintiff states, "Underwood shunned me at a professional
meeting just prior to my resignation.  This was far beyond
ordinary rudeness -- he humiliated me in front of my entire
department, and also refused to give me job-critical
information."  Pl. Decl. ¶ 37.

Underwood states, "I never purposefully ignored the
plaintiff at any time.  I did not refuse to speak to Julie Joki
about 'mission-critical' information regarding the Criterion
automated writing program at the conclusion of a meeting on
September 24, 2006, or at any other time."  Underwood Decl. ¶ 9.
Underwood explains that in September 2006, "the only class that
administered the Criterion exam was WR 115, a class Ms. Joki had
not taught since the 1997-98 school year.  . . . .  The only
connection with the Criterion to any of these classes [plaintiff
was teaching that fall] was its use as a placement test into our
WR 115 and WR 121, and Theresa Van Ravenhorst, RCC's Writing
Center Coordinator, scheduled this part of RCC's placement test,
not me."  Id.

## B.  Carlile

On September 25, 2006, Rogue Community College held a
faculty orientation.  Plaintiff states that defendant Galyn

6 - OPINION AND ORDER

Carlile "behaved in a threatening manner.  He saw me across the room.  He pointed at his own eyes and then pointed those two fingers at me in a jabbing gesture that I knew meant that he was displeased and intended to pressure me and make my work life difficult, just as he had been doing all along.  His face was very red with anger."  Pl. Decl. ¶ 19.

## III.  Plaintiff's Resignation

Classes for the fall 2006 term began September 26.  After plaintiff's second Writing 122 class on September 28, 2006, one of her students, Jerry Worthington, talked to Laam.  Worthington was "really upset because [plaintiff] had just asked him to leave her class."  Moseley Aff., Ex. 610, at 27 (Laam depo.).  Worthington said that when he disagreed with plaintiff in class about the definition of a word, plaintiff "got right in my face and told me to either shut up or get out of her class.  She yelled it."  Moseley Aff., Ex. 681, at 9.  Worthington was shocked and humiliated by plaintiff's behavior.  Worthington, who was then fifty years old, was so upset by plaintiff's conduct that he stopped attending her class.

Another student, Amanda Graves, corroborated Worthington's description of plaintiff's conduct.  Graves said plaintiff made "rude comments, hand gestures, telling [Worthington] if he doesn't shut up he can get out of the classroom."  Moseley Aff., Ex. 679, at 7 (page 15 of depo.).  Graves said, "It was almost like she was trying purposely to make him seem stupid, to humiliate him.  I have never, never seen a professor behave that

7 - OPINION AND ORDER

way." Id. (page 17 of depo.). According to Graves, when plaintiff noticed Worthington's absence at the next class, plaintiff said, "'I knew he would not be back, GOD, what a Chicken.'" Moseley Aff., Ex. 679, at 15 (Graves email to Laam).

Other students told Laam that plaintiff's "behavior was pretty erratic, kind of scary. And lot of them used the expression she was going to go over the edge." Moseley Aff., Ex. 610, at 28. Worthington told Laam that he thought "something was wrong with [plaintiff]." Moseley Aff., Ex. 610, at 28. Worthington thought plaintiff "seemed agitated." Id., Ex. 681, at 12. Another student, Barbara Jansson, described plaintiff's lectures as "erratic," "jumping from one completely different thing to another completely different thing. Just all over the place." Id., Ex. 680, at 15. Jansson said plaintiff was also physically "jumpy," moving around the classroom. Id. Plaintiff arrived late for class, once as much as 40 minutes late.

Several students reported to Laam that plaintiff said she "had a gun." Id., Ex. 610, at 28. Graves stated that during the first class on September 26, 2006, plaintiff mentioned "how she bought bullets and a gun to shoot soldiers feet including her son so they could not go to war." Id., Ex. 679, at 14.

Laam decided to ask other students in the class about plaintiff's conduct. He talked to a total of fourteen students by the evening of October 4, 2006. Every one of the students told Laam that plaintiff's conduct in class was strange and upsetting.

8 - OPINION AND ORDER

Based on the student's reports about plaintiff's conduct, Laam decided to observe her next class, which was October 5, 2006. Years before Laam became plaintiff's immediate supervisor, he had watched plaintiff teach one or two classes as a peer observer, at plaintiff's request.

At 7:50 a.m. on October 5, 2006, Laam emailed plaintiff, "Good Morning Julie! I will be visiting your WR122 class this morning at 9:30. Please feel free to contact me." Moseley Aff., Ex. 682. Although plaintiff does not challenge the authenticity of defendants' Exhibit 682, she states, "I had not received an email announcing his visit, nor did I have any prior knowledge of student complaints." Pl. Decl. ¶ 50.

Laam sat in back of plaintiff's classroom. Plaintiff arrived five minutes late. Laam testified that plaintiff "introduced me to the class, and I explained that I was her supervisor." Moseley Aff., Ex. 610, at 20. Laam testified that plaintiff told the class, "'I'm in trouble; I'm late,'" and "held out her hand to have it slapped." Id.

Plaintiff doesn't remember offering Laam her hand to be slapped, but states if she did do so, it was because she had already decided to resign. Plaintiff states Laam "hinted at student complaints" and said he was in class "to monitor" her. Pl. Decl. ¶ 50. Plaintiff states that Laam's presence interfered with her teaching and sent the wrong message to her students.

A few minutes after entering the classroom, plaintiff handed Laam a letter and told him to read it immediately. It was her

9 - OPINION AND ORDER

resignation letter.

Plaintiff states that she had drafted the resignation letter previously because of "the two major incidents with Underwood and Carlile right as the academic year was beginning." Pl. Decl. ¶ 52. Plaintiff states she had not decided to quit but Laam's presence that morning was the "final straw."

Plaintiff's resignation letter, dated October 5, 2006,

states:

> Please consider this letter my formal resignation as a
> full-time faculty member of the Humanities Department
> at Rogue Community College. I am resigning as of
> October 6, 2006.
>
> I regret that I must leave my position before the end
> of this current contract period, but I feel that I have
> no other options open to me. In two previous instances
> when I have needed to take leave due to family
> circumstances, I have been threatened with my job,
> harassed, locked out of my office, etc. I will never
> again subject myself to such treatment, so I am
> resigning.
>
> I request that RCC begin immediate processing of my
> termination. In the event that I am unavailable and
> RCC requires any signatures of me to expedite this
> processing, I have authorized my son, Tyler R. Joki
> (via a Power of Attorney), to act in my stead and sign
> any such documentation.
>
> As regards copyright issues and the Rogue OWL [Online
> Writing Lab], I forbid RCC to assume any form of
> ownership of my intellectual property. I wrote the OWL
> on my own time without compensation from RCC. The
> majority of content on the OWL was produced by me prior
> to my employment at RCC, and I own it. I will fie
> [sic] a suit for copyright infringement if RCC attempts
> to in any way usurp my ownership of my own material.
> RCC may not sell or publish the content on the OWL
> without first compensating me fairly; this includes
> compensation for the conceptualization as well as
> interface and functionality as the OWL interacts with

10- OPINION AND ORDER

> users on the web. I claim proprietary rights to the
> concept, design, content, and functionality, as well as
> the layout and user interface.
>
> I have been honored to instruct some of the most hard-
> working, intelligent students in southern Oregon; and
> for this privilege, I am grateful. It's unfortunate
> that I have had to subject myself to both personal and
> professional debasement in order to carry out my job.
> But, that's RCC's issue now, not mine.
>
> I resign now; I will not be returning to RCC as an
> instructor.

Moseley Aff., Ex. 606. Plaintiff added, "You [sic] favorite
Rogue Teacher" below her signature.

Laam testified that after reading the resignation letter, he
said to plaintiff, "why don't you just hang on to this. You
know, just probably you need to think about this. And she said
no." Id., Ex. 610, at 21. Plaintiff left the class briefly
while Laam remained with the students.

Plaintiff emailed the resignation letter to the entire
school. When plaintiff returned to the classroom, Laam left.
Plaintiff considers Laam's departure to be "a clear indication
that his goal had not been to problem-solve, but to ride herd on
me." Pl. Dec. ¶ 54.

Shortly after the class, Laam spoke to plaintiff. According
to plaintiff, Laam said, "Don't you think this is a bit extreme,
Julie," to which she responded, "Mike, if I worked anywhere but
RCC this would be extreme." Compl., Ex. A, at 9. Laam allegedly
responded, "I agree with you." Id.

According to Laam, he told plaintiff that quitting in the

11- OPINION AND ORDER

middle of a term would not be a good way to end her career at Rogue Community College. Laam states that plaintiff told him she planned to sell all of her furniture, move to Canada, start a farm with students, and march on Washington, D.C. with a thousand mules. Plaintiff said there would be a military draft and she needed to stop the president. When Laam asked if plaintiff was serious, she said she was.

Plaintiff now states, "I did say some silly things about my future plans, but none of it was serious and Laam would have known that. Given that I had resigned, with the final straw being his actions, I was not interested in sharing my actual future plans, if any, with someone like Laam." Pl. Decl. ¶ 53.

## STANDARDS

The court must grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). If the moving party shows that there are no genuine issues of material fact, then the nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). "To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations." Cafasso v.

12- OPINION AND ORDER

Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1061 (9th Cir. 2011).

## DISCUSSION

### I.  Statutes of Limitation

Three statutes of limitation apply to plaintiff's claims. For plaintiff's equal protection claims under § 1983, there is a two-year statute of limitations.  See Bonneau v. Centennial School Dist. No. 28J, 666 F.3d 577, 580 (9th Cir. 2012). Plaintiff must show that a discriminatory act occurred on or after July 18, 2006, two years before she filed her complaint in this court.

For plaintiff's state law claims, the alleged discriminatory act must have occurred within 180 days of the tort claim notice. Or. Rev. Stat. § 30.275.  Plaintiff must show a discriminatory act occurred on or after September 30, 2006, 180 days before March 29, 2007, when she sent the tort claim notice.

For plaintiff's Title VII claims alleging a hostile environment based on gender discrimination or retaliation, a discriminatory act must have occurred no more than 300 days before she filed her claim with the EEOC.  42 U.S.C. § 2000e-5(e)(1).  Plaintiff must show a discriminatory act occurred on October 5, 2006, 300 days before August 1, 2007, when plaintiff filed her EEOC claim.

### II.  Plaintiff's Claims Are Not Timely

13- OPINION AND ORDER

## A. Plaintiff's Title VII and State Law Claims

To decide the timeliness of plaintiff's hostile environment claims, I must "determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 120 (2002). "A discriminatory practice, though it may extend over time and involve a series of related acts, remains divisible into a set of discrete acts, legal action on the basis of each of which must be brought within the statutory limitations period." Lyons v. England, 307 F.3d 1092, 1108 (9th Cir. 2002). Plaintiff must present evidence that at least one discriminatory act occurred within the statutory limitations period for each claim.

Plaintiff's resignation on October 5, 2006 is the only discrete event that occurred within the statutory period for the Title VII and state law claims. A plaintiff claiming constructive discharge based on an alleged hostile environment "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." Penn. State Police v. Suders, 542 U.S. 129, 147 (2004).

Laam's presence at plaintiff's class did not create objectively intolerable conditions. As plaintiff's direct supervisor, Laam reasonably decided to investigate the reports from students who were frightened by plaintiff's erratic behavior in class. Laam was especially concerned about plaintiff's

14- OPINION AND ORDER

alleged statement that she had purchased a gun and bullets.

Plaintiff contends that Laam should have talked to her
before observing her class.  Laam did attempt to notify plaintiff
before attending the class, but plaintiff apparently did not
check her email.  Given the nature of the students' complaints,
Laam reasonably decided that he needed to investigate promptly.

Plaintiff also has failed to present evidence from which a
reasonable jury could find that Laam's attendance was an act of
retaliation or gender discrimination.  An "adverse employment
action," for purposes of a retaliation claim, is "'any adverse
treatment that is based on a retaliatory motive and is reasonably
likely to deter the charging party or others from engaging in a
protected activity.'"  Little v. Windermere Relocation, Inc., 301
F.3d 958, 970 (9th Cir. 2002) (quoting Ray v. Henderson, 217 F.3d
1234, 1244 (9th Cir. 2000)).  Plaintiff has not presented
evidence from which a reasonable jury could find Laam intended to
retaliate against plaintiff.

Plaintiff contends that the College handled student
complaints about male instructors differently.  Plaintiff,
however, does not cite any comparable situation involving
multiple complaints about an instructor's conduct in class.

Plaintiff also contends that her course load and the lack of
assigned literature classes shows an ongoing pattern of
discrimination.  Plaintiff agreed to her course load and class
assignments for the 2006-07 year, other than one writing course
in the spring term.  She has not presented evidence that her

15- OPINION AND ORDER

course load during the previous academic year was heavier than
other instructors' course loads.

I conclude that no reasonable jury could find plaintiff's
resignation was a constructive discharge, or that Laam's decision
to observe plaintiff's class was motivated by gender
discrimination or by a desire to retaliate against plaintiff.
Defendant Rogue Community College is entitled to summary judgment
on plaintiff's Title VII and state law discrimination claims.

## B. Equal Protection Claim Under 42 U.S.C. § 1983

To show that her equal protection claim is timely, plaintiff
must present evidence that a defendant violated her rights after
July 17, 2006. Courts generally apply Title VII standards to
equal protection claims under § 1983. See Sischo-Nownejad v.
Merced Community College Dist., 934 F.2d 1104, 1112 (9th Cir.
1991), superseded on other grounds as stated in Dominguez-Curry
v. Nevada Transp. Dep't, 424 F.3d 1027, 1041 (9th Cir. 2005).
Laam's attendance at plaintiff's class and plaintiff's
resignation cannot support an equal protection claim for the same
reasons plaintiff's Title VII fails.

Plaintiff cites two alleged incidents of discrimination
within the statutory period for the equal protection claim:
Underwood's alleged "shunning" of plaintiff at a department
meeting, and Carlile's alleged gesture of pointing at his eyes
and then at plaintiff during a faculty orientation. Neither
event is sufficient for a reasonable jury to find an equal
protection violation. Defendants are entitled to summary

16- OPINION AND ORDER

judgment on plaintiff's equal protection claim under § 1983.

## CONCLUSION

Defendants' motions for summary judgment (#103, #113, #118, #123, #128, and #133) are granted.

IT IS SO ORDERED.

DATED this _____ 18 _____ day of April, 2012.

OWEN M. PANNER
U.S. DISTRICT JUDGE

17- OPINION AND ORDER